UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------------X
```

T.C. and A.C., individually and on behalf of A.C.,  :

                                                   :

                                  Plaintiffs,  :

                                                     :               15-CV-3477 (VEC)

                  -against-  :

                                                   :          MEMORANDUM

NEW YORK CITY DEPARTMENT OF  :     OPINION & ORDER
EDUCATION,

                                                :

                              Defendant.  :

```
---------------------------------------------------------------X
```

VALERIE CAPRONI, United States District Judge:

      This case is brought under the Individuals with Disabilities in Education Act ("IDEA"),

20 U.S.C. § 1400 *et seq.*, by a parent, T.C., and child, A.C., seeking reimbursement from the

New York City Department of Education ("DOE") for the child's private school tuition.  As this

Court has expressed previously, the Court's heart goes out to the parent, who wants the very best

for her child.  The Court does not begrudge the parent's desire to place her child in the school

that she believes is best.  But the law does not guarantee children with disabilities—or, for that

matter, gifted or normally-talented children—the best education that money can buy.  What it

guarantees children with disabilities is a free and appropriate public education ("FAPE").  In this

case, the parent unilaterally elected to enroll her child in private school.  That was the parent's

prerogative, but because the Plaintiffs have not demonstrated that A.C. was denied a FAPE, they

have not demonstrated that the public should pay the tuition.

      Plaintiffs challenge the Individualized Education Program ("IEP") that the DOE created

for A.C. on multiple procedural and substantive grounds.  For the 2012-13 school year, T.C.

unilaterally elected to send A.C. to the Rebecca School ("Rebecca"), a private school that he had

attended for two years previously.  After a two-round State review process in which Plaintiffs

---

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:_____3/30/16_

prevailed at their first hearing and lost at their second, Plaintiffs appealed to this Court, seeking

reinstatement of the first administrative decision or a *de novo* review.  The parties cross-moved

for summary judgment.[1]  Plaintiffs' motion for summary judgment is DENIED and the DOE's

motion for summary judgment is GRANTED.

## BACKGROUND[2]

### I.    A.C.'s Background

A.C. was first diagnosed with autism when he was four years old, during the 2008-09

school year.  Tr. 189-90.[3]  After his autism diagnosis, A.C. attended the New York Institute for

Special Education's Preschool for the 2008-09 school year.  Tr. 190.  The following school year,

T.C. placed A.C. at Rebecca[4] for kindergarten because she disagreed with the school district's

---

[1]    Summary judgment, which is the preferred vehicle for determining IDEA cases, functions differently in the IDEA context.  *See T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  "'[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in the IDEA in developing the specific IEP at issue and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits.'"  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 225-26 (2d Cir. 2012) (alterations omitted) (quoting *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005)).

[2]    The Court assumes that any reader of this opinion is familiar with this area of the law but will, nevertheless, offer the customary apology that this opinion is—like the briefs and the other opinions cited herein—"replete with acronyms," *M.H.*, 685 F.3d at 223 n.1, and educational jargon.  A glossary of IDEA acronyms is attached as an appendix.  Moreover, because familiarity with the subject matter is presumed, this opinion will also dispense with the customary recitation of the statutory framework that applies.

[3]    Plaintiffs filed under seal a copy of the official administrative record from the New York State Education Department Office of State Review.  Unless otherwise specified, the exhibits cited herein are from the evidence admitted at the underlying impartial hearing before the impartial hearing officer ("IHO").  Plaintiffs' exhibits are marked with letters, and the DOE's exhibits are marked with numbers.  Citations to the impartial hearing transcript are marked "Tr. --."  The Court cites to the May 5, 2014 Findings of Fact and Decision of Impartial Hearing Officer Robert Briglio, as "IHO Decision" and the State Review Officer's ("SRO") January 8, 2015 Decision No. 14-083 as "SRO Decision."

The Court refers to the parties' briefing on their cross-motions for summary judgment as "Pls. Mem.," "Def. Mem.," "Pls. Reply," and "Def. Reply."

[4]    Rebecca is a private school for children aged four through twenty-one with neurodevelopmental delays in relating and communicating, including autism.  Tr. 89.  Rebecca uses the Developmental Individual Difference Relationship model ("DIR") to develop individualized education plans for each student.  Tr. 89, 90-91, 93.  In 2011-12, A.C. was in a class with an 8:1:3 student-to-staff ratio (eight students, one special education teacher, and three teaching assistants).  Tr. 95; Ex. 2, at 1; Ex. C, at 1.

recommended placement.  Tr. 191-92.  By the 2012-13 school year, A.C. had been enrolled at Rebecca for two years.

Plaintiffs now seek direct funding for tuition owed to Rebecca for the 2012-13 school year, which was A.C.'s third year at Rebecca.  At the time the school district prepared A.C.'s IEP for the 2012-13 academic year, he was eight years old, *see* Ex. 1, at 1,[5] and he demonstrated delays in relating, communicating, and sensory processing, Ex. 2, at 1-2.  A.C. spoke very quickly, often to the point of being incomprehensible.  Tr. 98, 147, 158.  He also had difficulty interacting with peers and required adult support to do so.  Tr. 112.  When A.C. became "dysregulated," meaning he felt misunderstood or did not understand or like what was being asked of him, he would scream, run out of a room, or throw himself onto the floor.  Tr. 98; Ex. 2, at 1.  When "regulated," however, A.C. could participate in about ninety percent of a group's activities.  Ex. 2, at 1.  A.C. could read over one hundred words and simple sentences and could add using numbers up to twenty.  Ex. 2, at 3-4; Tr. 98-99, 136.

## II.    The Committee on Special Education's ("CSE") 2012-13 IEP

On May 17, 2012, a CSE met to develop an IEP for A.C. for the 2012-13 academic year. Ex. 1, at 16; Tr. 11-12.  The following individuals attended the meeting: (1) a school district representative and school psychologist, Dr. Craig Czarnecki; (2) a DOE special education teacher; (3) a DOE social worker; (4) T.C.; (5) a social worker from Rebecca; (6) A.C.'s then-current teacher at Rebecca; and (7) a parent representative.  Ex. 1, at 18; Tr. 7, 10-11.

To prepare for the CSE meeting, Dr. Czarnecki reviewed a psychological evaluation of A.C. dated February 27, 2009 ("2009 Evaluation Report"), A.C's IEP for the prior year, and a

---

[5]     Exhibit 1 in the sealed record is a copy of A.C.'s 2012-13 IEP.  This exhibit, however, is missing several pages at the end of the document.  The Memorandum of Law in Support of Plaintiff's [sic] Motion for Summary Judgment on All Claims Under the Individual with Disabilities Education Act (IDEA) attaches a complete version of the 2012-13 IEP as Exhibit 1 (Dkt. 17-1).  Thus, all of the Court's citations to Exhibit 1 refer to the Exhibit 1 attached to Plaintiffs' Memorandum of Law and not to the Exhibit 1 in the sealed record.

progress report on A.C. prepared by Rebecca staff in December 2011 ("2011 Rebecca Progress Report").  Tr. 12.  Dr. Czarnecki has never met A.C., Tr. 35, and has never been a direct service provider for autistic students, Tr. 47.  During the meeting, the participants discussed the 2011 Rebecca Progress Report, A.C.'s progress, his then-current level of functioning, and his educational needs.  Tr. 193.  Also during the meeting, the participants discussed the school district's recommendations, including that A.C. be placed in a 6:1:1 classroom setting and that A.C. participate in standardized assessments; T.C. and the two representatives from Rebecca expressed concern about the former, and T.C. expressed concern about the latter.  Tr. 45, 194-95.  According to T.C., the school district responded to the concerns by explaining that the 6:1:1 setting and the standardized assessments with extended time were all the district could do for A.C.  Tr. 194, 195-96.

The IEP that came out of this meeting was based entirely on: the information discussed at the CSE meeting and provided by T.C. and A.C.'s teacher at Rebecca; the 2009 Evaluation Report; and the 2011 Rebecca Progress Report.  Tr. 13-20.  The school district did not conduct any separate evaluations of A.C. prior to preparing the IEP or do any classroom observations.  Tr. 42-43, 45; Ex. 1, at 1.  The IEP indicates that A.C.'s overall cognitive functioning is "Low Average," Ex. 1, at 1, and that his reading and math skills are at a kindergarten level, Ex. 1, at 16.  It also notes that A.C. "needs a large amount of sensory input throughout the day to maintain his regulation."  Ex. 1, at 2.

The IEP calls for a 6:1:1 special education class in a specialized school.  Ex. 1, at 3, 11; Tr. 21.  The IEP recommends additional services, including speech language therapy twice per week individually and twice per week in a group of three, occupational therapy ("OT") twice per week individually and twice per week in a group of two, and counseling once per week individually and once per week in a group of two.  Ex. 1, at 12.  The IEP does not provide parent

counseling and training services.  *See* Ex. 1.  The IEP articulates fifteen annual goals for A.C.,

Ex. 1, at 4-11, and identifies strategies and tools to address his sensory needs, Ex. 1, at 3.  The

IEP provides that A.C. will participate in the same state and school district assessments as

general education students but provides testing accommodations, including double the amount of

time, a quiet room with minimal distractions, directions and questions read and reread aloud, and

the recording of answers in any manner.  Ex. 1, at 13-14.  The "Promotion Criteria" section of

the IEP, enabling the CSE to specify standard or modified criteria to promote A.C. to the next

grade, is blank.  Ex. 1, at 17.

The parties dispute whether T.C. ever received the IEP or Final Notice and

Recommendation ("FNR") providing a placement for A.C.  The DOE contends, based on an

FNR dated June 6, 2012, that it mailed T.C. the FNR, which recommended placement in a 6:1:1

special class in a specialized school at P168X within P842X in the Bronx.  *See* Ex. 3.  At the

IHO hearing, Dr. Czarnecki and a DOE clerical employee testified regarding the standard

procedures for mailing IEPs and FNRs to establish a presumption that those documents were

mailed to T.C.  Tr. 25-27, 214-221.  T.C., however, alleges that she never received an IEP or an

FNR for the 2012-13 school year and that a district staff member informed her in October 2013

that there was nothing on file regarding a 2012-13 placement.  Tr. 196-97.  Nevertheless, on June

18, 2012, T.C. faxed a letter to the school district stating that she opposes the 6:1:1

recommendation made at the CSE meeting, that she has received neither the IEP nor a school

placement, and that she is placing A.C. at Rebecca and will seek an impartial hearing to pursue

public funding for that placement.  Ex. B; Tr. 196.  The school district received the letter on June

22, 2012, Ex. B, but T.C. never received a response, Tr. 198.  T.C. placed A.C. at Rebecca for

the 2012-13 school year.  Ex. E; Tr. 198.

III.    **The Administrative Proceedings**

A.  **The IHO Decision**

On August 9, 2013, T.C. filed a due process complaint, raising the following issues: (1) the school district representative at the CSE was unqualified; (2) the school district relied on insufficient evaluative data to assess A.C.'s needs, including the outdated 2009 Evaluation Report; (3) the school district failed to provide the IEP and a placement to T.C.; and (4) the IEP was insufficient to meet A.C.'s needs, especially the 6:1:1 classroom, the omission of parent training and counseling and appropriate sensory supports, the requirement that A.C. participate in standardized testing, the proposal of insufficient goals, and the failure to recommend appropriate teaching instruction.  Ex. A.  T.C. sought a declaratory finding that the school district failed to provide a FAPE for the 2012-13 academic year and sought direct funding and reimbursement for Rebecca tuition.  *Id.* at 2-3.

An IHO heard the matter over three days.  IHO Decision 2.  Dr. Czarnecki and a DOE office clerical employee testified for the DOE.  Tr. 5-77, 211-22.  For T.C., three witnesses from Rebecca testified —the Director (Tina McCourt), A.C.'s classroom teacher, and a speech therapist,—and T.C. also testified. Tr. 87-210.

On May 5, 2014, the IHO ruled in favor of T.C.  *See generally* IHO Decision.  The IHO concluded that the school district failed to prove that it offered A.C. a FAPE for the 2012-13 academic year.  *See generally id.* at 18-26.  Specifically, the IHO found that A.C. was denied a FAPE on the following procedural and substantive grounds: failure to conduct a timely evaluation of A.C., including psychological and educational testing, *id.* at 19-21; denying T.C. the opportunity to meaningfully participate in the CSE meeting because the district failed to explain adequately how services would be provided in a 6:1:1 class, *id.* at 21-22; failure to consider including DIR or related methodology in the IEP, *id.* at 22; inappropriately

recommending a 6:1:1 setting, *id.* at 22-25; and recommending that A.C. take standardized tests not on the basis of A.C.'s needs but based on policy, *id.* at 25-26.  The IHO found that the failure to recommend parent training in the IEP did not contribute to denial of a FAPE.  *Id.* at 25.  The IHO also determined that Rebecca was an appropriate placement for A.C., *id.* at 26-29, and that the equities favored direct tuition funding, *id.* at 30-32.

### B.  The SRO Decision

The DOE appealed the IHO decision to the Office of State Review.  On January 8, 2015, the SRO reversed the IHO on all grounds.  *See generally* SRO Decision 5-15.  Because the SRO concluded that the DOE had provided A.C. a FAPE, it did not consider whether Rebecca was an appropriate placement for A.C. or whether equitable considerations supported the Plaintiffs' claims.

The SRO held that the school district representative at the CSE meeting was sufficiently qualified.  *Id.* at 5.  The SRO agreed with the IHO that the failure to conduct a required triennial evaluation of A.C. was a procedural violation but disagreed that the violation led to the denial of a FAPE, holding that the CSE considered sufficient evaluative information without having an updated psychological evaluation.  *Id.* at 6-8.  In addition, the SRO ruled that the CSE appropriately determined that A.C. could participate in standardized assessments because there was no evidence that he was unable to participate in such testing.  *Id.* at 8.  As to the failure to include DIR in the IEP, the SRO held that "no evidence was presented to the CSE to suggest that the student's instruction should be limited to one specific methodology to enable him to receive educational benefit . . . ."  *Id.* at 9.  The SRO rejected the IHO's conclusion that the 6:1:1 ratio was inappropriate for several reasons: (1) the IHO's rationale for finding that a 6:1:1 special class was "less restrictive" than A.C.'s class at Rebecca was flawed because restrictiveness as used in IDEA pertains only to the extent to which students with disabilities are educated in

classrooms with non-disabled students—it does not relate to the student-adult ratio, *id.* at 10; (2) there is nothing in the record to indicate that A.C. required 1:1 instruction, and the services offered were consistent with state requirements, *id.* at 11; and (3) the IEP was not devoid of 1:1 support because it provided for individual OT, individual speech-language therapy, and individual counseling, *id.* at 12. The SRO also rejected the IHO's determination that transitional support services and consultant teacher services were required because those services are only intended for special education students who are placed in general education class settings, which A.C. would not have been. *Id.* at 11-12. Finally, the SRO held that, even if there were a procedural violation because the school district did not mail the IEP or FNR to T.C., there was no evidence in the record that the purported violation resulted in the denial of FAPE. *Id.* at 14-15. The SRO noted that, notwithstanding any procedural missteps, T.C. was able to participate in the decision-making regarding the IEP and notified the school district of her intent to place A.C. at Rebecca unilaterally given her concerns about the 6:1:1 classroom and the standardized testing. *Id.*[6]

On May 4, 2015, Plaintiffs appealed the SRO Decision to this Court, and the parties have cross-moved for summary judgment.

## DISCUSSION

### I.      Standard of Review

"In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'" *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837-38 (2d Cir. 2014) (quoting *Gagliardo*

---

[6]      The IHO did not address Plaintiffs' claim that A.C. was denied a FAPE because they never received the IEP or FNR, although the SRO determined that Plaintiffs did sufficiently raise it in their due process complaint. SRO Decision 12 & n.6.

*v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)).  In undertaking this independent

review, courts are "restrained by our lack of specialized knowledge and educational expertise;

we must defer to the administrative decision particularly where the state officer's review has

been thorough and careful."  *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138-39

(2d Cir. 2013) (quotation marks, alteration, and citation omitted); *see also M.O. v. N.Y.C. Dep't

of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) ("While the district court must base its decision on

the preponderance of the evidence, it must give due weight to the administrative proceedings,

mindful that the judiciary generally lacks the specialized knowledge and experience necessary to

resolve persistent and difficult questions of educational policy.").

Two factors guide the level of deference owed to administrative opinions—"the quality

of the [administrative] opinion and the court's institutional competence."  *C.F. ex rel. R.F. v.

N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).  To determine the quality of an opinion,

"courts must look to the factors that normally determine whether any particular judgment is

persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it

was based on substantially greater familiarity with the evidence and the witnesses than the

reviewing court."  *M.W.*, 725 F.3d at 139 (quotation marks and citation omitted); *M.O.*, 793 F.3d

at 243 ("Deference is particularly appropriate when the state officer's review 'has been thorough

and careful,' but still we do not 'simply rubber stamp administrative decisions.'" (quoting *R.E. v.

N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184 (2d Cir. 2012))).  The "institutional competence"

question hinges on whether a matter involves "'persistent and difficult questions of educational

policy,'" *C.L.*, 744 F.3d at 838 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v.

Rowley*, 458 U.S. 176, 208 (1982)), or "'issues of law,' such as 'the proper interpretation of the

federal statute and its requirements,'" *Lillbask*, 397 F.3d at 82 (alteration omitted) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997)).[7]

After a thorough review, the Court finds that the SRO's opinion is well-reasoned and carefully explained.  The Court therefore reviews it deferentially except as to questions of law.  Relevant to this dispute, "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures."  *C.F.*, 746 F.3d at 77 n.7 (quoting *M.H.*, 685 F.3d at 244).  "Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress."  *Id.*

## II.     *Burlingon/Carter* **Prong I**

A parent who is dissatisfied with a school district's proposed placement for his or her disabled child may enroll the child in private school and then seek tuition reimbursement from the state.  "Parents who unilaterally place their child in a private school do so 'at their financial risk.'"  *M.O.*, 793 F.3d at 243 (quoting *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014)).  Whether the parent's request for reimbursement will be successful is determined by the so-called *Burlington/Carter* test.  Under New York law and prong one of *Burlington/Carter,* the school district has the initial burden to establish that the IEP was appropriate, *i.e.,* that it actually provided a FAPE.  *M.O.*, 793 F.3d at 243; *M.W.*, 725 F.3d at 135.  If the district carries that burden, then reimbursement may not be ordered.  If the district has not offered a FAPE, then under prongs two and three of the *Burlington/Carter* test, reimbursement

---

[7]         For a thorough discussion of judicial deference to SRO opinions, see *M.H.*, 685 F.3d at 240-44.

may be ordered if the parents demonstrate that the private school they selected was appropriate and that the equities favor them.  *M.O.*, 793 F.3d at 243; *M.W.*, 725 F.3d at 135.

The first prong of *Burlington/Carter* involves "a two-part inquiry that is, first, procedural, and second, substantive."  *M.W.*, 725 F.3d at 139 (quotation marks and citation omitted).  Claims predicated on procedural violations "only entitle parents to reimbursement if they 'impeded the child's right to a free appropriate public education,' 'significantly impeded the parents' opportunity to participate in the decisionmaking[sic] process,' or 'caused a deprivation of educational benefits.'"  *C.F.*, 746 F.3d at 78-79 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).  Nevertheless, the procedural inquiry "is no mere formality, as adequate compliance with the procedures prescribed [will] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252-53 (2d Cir. 2009) (*per curiam*) (quotation marks and citations omitted).  Procedural violations must be examined under the totality of the circumstances, *M.W.*, 725 F.3d at 139, and even a procedural violation that in and of itself does not deny a student a FAPE may inform the overall determination of a placement's substantive adequacy, *C.F.*, 746 F.3d at 81.

Relative to the substantive validity, the test asks "whether [the IEP] was 'reasonably calculated to enable the child to receive educational benefits.'"  *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 151 (2d Cir. 2014) (quoting *Rowley*, 458 U.S. at 207).  An IEP is substantively adequate if the IEP is "likely to produce progress, not regression, and [if the IEP] afford[s] the student with an opportunity greater than mere trivial advancement.  However, it need not furnish every special service necessary to maximize each handicapped child's potential."  *M.O.*, 793 F.3d at 239 (quotations omitted); *see also M.H.*, 685 F.3d at 224; *A.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 173 (2d Cir. 2009).  Unlike

procedural violations, if the IEP is not substantively adequate, the parent is automatically entitled to tuition reimbursement.  *R.E.*, 694 F.3d at 190.

Plaintiffs' arguments in this Court implicate the first *Burlington/Carter* prong.  In their appeal, Plaintiffs raise all the same procedural and substantive issues regarding the IEP as they did in their due process complaint.  *See generally* Pls. Mem.

## A.  Procedural Errors Did Not Result in Denial of a FAPE

### 1.  The Evaluative Material Was Sufficient Without the Triennial Evaluation

Plaintiffs contend that the CSE relied on insufficient evaluative data in crafting A.C.'s IEP, particularly because the CSE conducted neither the triennial evaluation of A.C. mandated by New York State nor any other independent evaluation.  Pls. Mem. 10-13.  The DOE argues that, although the failure to conduct the triennial evaluation was a procedural violation, the CSE nonetheless relied on sufficient evaluative material so that the lack of a triennial evaluation did not deny A.C. a FAPE.  Def. Mem. 10-13.

The Court finds that the SRO's conclusion, that the CSE considered sufficient evaluative information despite the failure to conduct the triennial evaluation, is well-reasoned and supported by the record; therefore, the SRO's conclusion is entitled to deference.  *See, e.g.*, *C.L.*, 744 F.3d at 838 (courts should generally defer to the SRO over the IHO unless the SRO's decision is insufficiently reasoned and the IHO's decision is more carefully considered).  While acknowledging that the DOE was required to conduct a triennial evaluation of A.C. prior to the May 2012 CSE meeting, *see* SRO Decision 7 (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4 (b)(4); 34 C.F.R. § 300.303(b)(1)-(2)), the SRO examined all the materials relied upon by the CSE and found that this procedural violation did not impede T.C.'s ability to participate in the decision-making process or deprive A.C. of education benefits or a FAPE.

In so concluding, the SRO noted that to draft the IEP, the CSE relied on the 2009 Evaluation Report, the 2011 Rebecca Progress Report, A.C.'s 2011 IEP, and information discussed at the May CSE meeting, including information provided by T.C. and A.C.'s teacher at Rebecca. SRO Decision 6-7 (citing Tr. 12, 13-21; Ex. 1, at 17-18; Ex. 2). Further, the SRO detailed the numerous evaluative topics covered in the 2011 Rebecca Progress Report and concluded that, collectively, the materials adequately described A.C.'s needs with respect to cognition, academics, language, social skills, and sensory regulation. SRO Decision 7 (citing Tr. 12-21; Ex. 2). Indeed, the SRO and the IHO agreed that the 2011 Rebecca Progress Report was "comprehensive." SRO Decision 7; IHO Decision 20. The SRO also found that the CSE incorporated information from the 2011 Rebecca Progress Report into the IEP. SRO Decision 7 (citing Tr. 12-21; Ex. 1; Ex. 2).

In contrast, the IHO, ignoring ample opposing case law and the information that was provided orally by T.C. and A.C.'s teachers, concluded that school-based information is not an adequate substitute for testing. IHO Decision 20. According to the IHO, updated testing was required largely because the IEP recommended placing A.C. in a less restrictive class (6:1:1 special class, which has a 3:1 student-staff ratio, versus A.C.'s 8:1:3 Rebecca class, which has a 2:1 student-staff ratio). *Id.* As the SRO explained, however, the IHO misunderstood the meaning of restrictiveness under IDEA, SRO Decision 11-12; "restrictiveness" pertains to the extent to which disabled students are educated with non-disabled students, not to the size of the student-staff ratio in special classes, *see* 20 U.S.C. § 1412(a)(5)(A). Setting aside the IHO's misunderstanding and interpreting IHO's concern to be the absence of an updated psychological evaluation in light of a change in A.C.'s student-staff ratio class setting, there is nothing in the

record to suggest that, as a substantive matter, a 6:1:1 special class did not meet A.C.'s needs, as discussed *infra*. Therefore, the IHO erred in attributing significance to the procedural violation.[8]

Because the SRO's decision was well-reasoned and supported by the record, while the IHO's decision was based on an incorrect interpretation of the law and the record, the Court defers to the SRO. The failure to conduct a triennial evaluation was a procedural violation, but it did not result in the denial of a FAPE, impede T.C's ability to participate in the decision-making process, or cause a deprivation of educational benefits because the CSE relied on sufficient materials and "use[d] a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information" about A.C.  20 U.S.C.A. § 1414(b)(2)(A); *see A.A. v. N.Y.C. Dep't of Educ.*, No.14-cv-8483 (ALC), 2015 U.S. Dist. LEXIS 115005, at *40-43 (S.D.N.Y. Aug. 24, 2015) (failure to conduct triennial evaluation was not fatal given the information that was available to the CSE, including a progress report, a classroom observation report, and reports and testimony from the school's representatives and teachers); *N.K. v. N.Y.C. Dep't of Educ.*, 961 F. Supp. 2d 577, 587-88 (S.D.N.Y. 2013) (failure to conduct a triennial evaluation was not fatal; CSE relied on a classroom observation, a report from the child's current school, and psychoeducational and psychological evaluations several years old); *D.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 331 (S.D.N.Y. 2013) (failure to conduct the triennial evaluation—"a single measure"—did not render the IEP invalid given "a number of sufficient evaluations, reports, and observations in assessing the Student's skill levels").

---

[8]     Both Plaintiffs and the IHO rely on *C.L. v. N.Y.C. Dep't of Educ.*, No. 12 CIV. 1676(JSR), 2013 WL 93361 (S.D.N.Y. Jan. 3, 2013), *aff'd* 552 F. App'x 81 (2d Cir. 2014), *as amended*, (Feb. 3, 2014), and *C.F.*, 746 F.3d 68, to argue that the IEP relied on insufficient evaluative material. Pls. Mem. 11; IHO Decision 21. Those cases, however, addressed whether, as a substantive matter, the evaluative material relied on by the CSE supported the class ratios recommended in the respective IEPs. *C.L.*, 2013 WL 93361, at *7-8; *C.F.*, 746 F.3d at 81-82. In contrast, the issue here is whether the failure to conduct a triennial evaluation was a procedural violation that denied A.C. a FAPE because it resulted in the preparation of an IEP based on insufficient evaluative material. The Court separately addresses the substance of the 2012-13 IEP, *infra*.

### 2.  The CSE Representative Was Qualified

The IHO held that no one at the CSE meeting was able to explain to T.C. how the teacher

in the recommended 6:1:1 class would address A.C.'s needs.  IHO Decision 21-22.  According to

the Plaintiffs and the IHO, the absence of such a person denied A.C. a FAPE because it

prevented T.C. from participating in the decision-making process.  Pls. Mem. 16-19; Pls. Reply

13-14; IHO Decision 21-22.  Plaintiffs also claim that Dr. Czarnecki was not a qualified school

district representative because he was familiar neither with the general education curriculum,

specifically the state assessments in which A.C. was to participate per the IEP, nor with what

resources were available to address T.C.'s concerns about the 6:1:1 setting.  Pls. Mem. 17.[9]  The

DOE argues that the IHO applied the wrong standard to determine whether Dr. Czarnecki was a

qualified representative.  Def. Mem. 16-17.  The SRO held that Dr. Czarnecki was a qualified

representative.  SRO Decision 5.

The Court agrees with the SRO regarding Dr. Czarnecki's qualifications to be a district

representative.  For CSE meetings, federal and New York law require:

> [A] representative of the local educational agency who (I) is qualified to provide,
> or supervise the provision of, specially designed instruction to meet the unique
> needs of children with disabilities; (II) is knowledgeable about the general
> education curriculum; and (III) is knowledgeable about the availability of
> resources of the local educational agency.

20 U.S.C § 1414(d)(1)(B)(iv); *see also* 34 CFR 300.321(a)(4); N.Y. Comp. Codes R. & Regs. tit.

8, § 200.3(a)(1)(v).  As the SRO discussed, *see* SRO Decision 5, Dr. Czarnecki satisfied those

requirements based on the following testimony: he has worked for the district for over nineteen

---

[9]     Plaintiffs also argue that the IHO, in deciding that the recommended 6:1:1 placement was inappropriate,
discredited the testimony of Dr. Czarnecki due to its lack of particularity and his personal lack of experience treating
autistic students and working within a 6:1:1 program.  Pls. Mem. 18; Pls. Reply 13.  The credibility of Dr.
Czarnecki's testimony, however, goes to whether the 6:1:1 special class recommendation was substantively
appropriate; it does not go to whether Dr. Czarnecki was a qualified CSE representative or whether the alleged lack
of qualification resulted in a procedural violation that denied A.C. a FAPE.  The Court addresses the substance of
the recommended 6:1:1 placement *infra*.

years; he has a doctorate in clinical school psychology and is a licensed and certified school

psychologist; his duties include conducting psychoeducational evaluations, participating in CSE

meetings, helping to develop IEPs, and case management; he is familiar with the special

education services offered by the district; and he provides special education counseling services.

Tr. 7-11.[10]

Notwithstanding the IHO Decision, *see* IHO Decision 21-22, nothing in the regulations

requires Dr. Czarnecki to have either taught children who have the same disability as A.C. or to

have had personal experience teaching a 6:1:1 class in order to be a district representative. *GB v.*

*N.Y.C. Dep't of Educ.*, No. 14 CIV. 9951(CM), 2015 WL 7351582, at *10 (S.D.N.Y. Nov. 5,

2015) (holding the law "does not require any other specific qualifications" beyond the statutory

requirements to be a CSE district representative). Thus, to the extent that the IHO and Plaintiffs

contend that T.C.'s participation was impeded because Dr. Czarnecki was unable to address

T.C.'s specific concerns about the 6:1:1 recommended placement, Dr. Czarnecki was not

required as the school representative under federal and state law to be able to address the specific

details of a given recommended program. In addition, T.C. was able to participate by voicing

her concerns during the meeting, Tr. 194-95, 208-09, and Dr. Czarnecki was able to discuss the

availability of resources, including informing T.C. that the district could not provide a different

classroom setting, Tr. 194-95; *see also A.M. ex rel. Y.N.*, 964 F. Supp. 2d at 280 (holding that,

---

[10]     *See A.M. ex rel. Y.N. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 280 n.4 (S.D.N.Y. 2013) (rejecting
argument that a special education teacher did not qualify as district representative when he had "extensive special
education experience as a teacher, as a mentor to other teachers, and as a supervisor and district representative for
his CSE region"); *A.D. v. N.Y.C. Dep't of Educ.*, No. 12 CIV. 2673 (RA), 2013 WL 1155570, at *7 (S.D.N.Y. Mar.
19, 2013) (finding special education teacher qualified as district representative to CSE where there was no evidence
that she lacked relevant knowledge of district programs and resources); *A.S. ex rel. Mr. S. v. N.Y.C. Dep't of Educ.*,
No. 10-CV-9 (ARR) (RML), 2011 WL 12882793, at *11-12 (E.D.N.Y. May 26, 2011) (finding district adequately
represented by employees even though district employee testified "I haven't seen [a 6:1:1 site] in a long time" and
holding that any potential procedural violation due to the lack of a qualified representative did not impede the
parents' opportunity to participate because the mother voiced her concerns at the CSE meeting and because DOE
had no alternative placements available), *aff'd sub nom. A.S. ex rel. S. v. New York City Dep't of Educ.*, 573 F. App'x
63 (2d Cir. 2014).

despite the procedural violation as to the composition of the CSE, "all that is required is a parent's participation" and that because the parent voiced her objections and the CSE considered them, the violation did not impede the parent's opportunity to participate in the decision-making process).   Moreover, another court in this district has already determined that Dr. Czarnecki is a qualified CSE district representative.  *G.B.*, 2015 WL 7351582, at *10.

In short, the Court concurs with the SRO that Dr. Czarnecki was a qualified CSE representative, and there was no procedural violation associated with the composition of the CSE.

### 3.  Defendant Made a Sufficient Showing that the IEP Was Mailed

Plaintiffs argue that because the school district never mailed the IEP or FNR to T.C., T.C. was denied a meaningful opportunity to participate in the IEP process and A.C. never received a public school option.   Pls Mem. 27-28.  According to Plaintiffs, T.C. decided to take the financial risk of unilateral placement relying on the fact that the district neither provided an IEP or school placement nor responded to T.C.'s letter notifying the district of this failure.  *Id.* Plaintiffs further argue that the district did not meet its burden to establish the presumption of mailing and receipt because the district's witnesses did not have personal knowledge, and, even if the witnesses did have personal knowledge, Plaintiffs rebutted the presumption because T.C. testified that an employee of the school district told her that an FNR was never issued.  *Id.* at 28-29.  The DOE asks this Court to accept the conclusion of the SRO, namely that the facts justify a presumption that the DOE mailed the IEP and FNR and that, even if they do not, this was a procedural violation that did not result in the denial of a FAPE.  Def. Mem. 24-26.

Here again, the Court finds that the SRO's conclusion is well-reasoned and supported by the record; therefore, the SRO's conclusion is entitled to deference.  The SRO thoroughly analyzed (1) what notice the law requires parents to receive regarding the IEP and school

placement and (2) the facts presented in the record to establish a presumption of mailing.  SRO

Decision 13-14.  The IHO did not address the issue of receipt of the IEP and FNR, but Plaintiffs

did raise this issue in their due process complaint.  Ex. A, at 2.

"[T]he IDEA requires only that a valid IEP be in effect 'at the beginning of each school

year.'"  *Tarlowe v. N.Y.C. Bd. of Educ.*, No. 07 CIV. 7936 (GEL), 2008 WL 2736027, at *6

(S.D.N.Y. July 3, 2008) (quoting 20 U.S.C. § 1414(d)(2)).  "An education department's delay

does not violate the IDEA so long as the department 'still ha[s] time to find an appropriate

placement . . . for the beginning of the school year in September.'"  *Id.* (quoting *Bettinger v.*

*N.Y.C. Bd. of Educ.*, No. 06 CV 6889 (PAC), 2007 WL 4208560, at *8 & n.26 (S.D.N.Y. Nov.

20, 2007)).  There is no requirement that a parent receive written notice of a school placement

before the beginning of the school year.  *See* SRO Decision 13 (citing cases).  Nonetheless, in

order to provide a FAPE, a parent must necessarily receive some form of notice of the school

placement by the start of the school year.  *See id.* at 14.

New York law provides a presumption of mailing and receipt if there is proof of a

standard office practice or procedure designed to ensure that properly addressed mail is sent.

*Nassau Ins. Co. v. Murray*, 46 N.Y.2d 828, 829 (1978).  "As long as there is adequate testimony

by one with personal knowledge of the regular course of business, it is not necessary to solicit

testimony from the actual employee in charge of the mailing."  *Matter of Lumbermens Mut. Cas.*

*Co. (Collins)*, 521 N.Y.S.2d 432, 434 (1st Dep't 1987) (citing *Bossuk v. Steinberg*, 58 N.Y.2d

916, 919 (1983)).  To rebut the presumption, the intended recipient cannot just deny receipt but

must demonstrate that the sender's "routine office practice was not followed or was so careless

that it would be unreasonable to assume that the notice was mailed."  *Nassau*, 386 46 N.Y.2d at

829.

Here, as the SRO found, there is sufficient evidence to establish a presumption of mailing and receipt of the IEP and FNR, and there is insufficient evidence to rebut the presumption.  Dr. Czarnecki, based on his knowledge of DOE office procedures and his own experience mailing IEPs, described the routine DOE practice for mailing IEPs, including the computer system used by CSE staff and the mail clerk's process for mailing.  Tr. 25-27, 33-34, 68.  Another district employee described the mailing process, providing further detail as to the data and record keeping programs used and the step-by-step process from the generation of the FNR to the mailroom to the mailbox.  Tr. 212-17.  The record also includes a copy of the FNR dated June 6, 2012.  Ex. 3.  Notwithstanding the Plaintiffs' contention to the contrary, the Court does not find DOE's testimony to be vague or to reflect a lack of personal knowledge of the mailing practice.  Plaintiffs' evidence—T.C.'s testimony that she never received the IEP or FNR, Tr. 196, and T.C.'s June 18, 2012 letter to the district, Ex. B—does not rebut the presumption of mailing and receipt because it simply constitutes a denial of receipt; it does not demonstrate that the DOE's routine practice was not followed or was so careless that it would be unreasonable to assume the documents were mailed.  *See Nassau*, 46 N.Y.2d at 829.

The Court also agrees with the SRO that, even if the presumption were rebutted by T.C.'s testimony that a district staff member informed her in October 2013 that there was nothing on file regarding a 2012-13 placement, Tr. 197, this procedural violation did not impede T.C.'s participation in the decision-making process or result in the denial of a FAPE.  In her June 18 letter, T.C. informed the district that she had not received the IEP or the FNR and also expressed concern regarding specific aspects of the IEP.  More importantly, she notified the district that she had enrolled A.C. at Rebecca and intended to pursue public funding.  Ex. B.  This letter demonstrates that T.C. did not need more information about the IEP or about A.C.'s

recommended school placement to make the decision to pursue a private school education and

seek tuition reimbursement; she had already made up her mind based on her existing concerns.[11]

### 4. Parent Counseling and Training

Plaintiffs' final procedural argument is that the IEP is legally inadequate because it fails

to provide for parent counseling and training.  Pls. Mem. 26.  The DOE disagrees, Def. Mem. 24,

as did the IHO, IHO Decision 25.[12]  Plaintiffs are correct that New York education law mandates

counseling for parents of students with autism.  N.Y. Comp. Codes R. & Regs. tit. 8, §

200.13(d).  Thus, "failing to include provisions for parent counseling and training was a clear

procedural error in the IEP."  *N.S. v. N.Y.C. Dep't of Educ.*, No. 13-CV-7819(VEC), 2014 WL

2722967, at *9 (S.D.N.Y. June 16, 2014) (citing *C.F.*, 746 F.3d at 79-80).  Nevertheless, because

school districts are required to provide parent counseling regardless of whether the IEP provides

for it, failure to include counseling in the IEP is unlikely to lead to a denial of a FAPE or warrant

tuition reimbursement.  *Id.* (citing *M.W.*, 725 F.3d at 142; *R.E.*, 694 F.3d at 191).  In this case,

the failure to provide counseling, considered on its own or in combination with the other

---

[11]     The June 18 letter indicates that T.C.'s decision to send A.C. to Rebecca was final.  T.C. did not ask for the
IEP or FNR or request additional information to help her decide whether to send A.C. to Rebecca.  Instead, the
decision was a foregone conclusion—she informed that district that she had *already* enrolled A.C. at Rebecca, that
she would request public funding as a next step, and that she wanted the district to arrange busing to transport A.C.
to and from Rebecca.  Ex. B.

         If T.C. had explicitly requested the IEP and FNR because she was still considering whether to enroll A.C.
at Rebecca, the possible-failed mailing procedural violation could have resulted in denial of a FAPE or impeded
T.C.'s right to participate in the decision-making process.  (Even if it did not, best practice would be for the DOE to
re-mail the IEP and FNR when a parent reports a lack of receipt.)  Be that as it may, there was no procedural
violation as of June 18, 2013, when T.C. mailed her letter to the DOE.  As explained above, the DOE is only
required to provide a school placement by the start of the school year.  *Tarlowe*, 2008 WL 2736027, at *6 (citing 20
U.S.C. § 1414(d)(2)).  At the earliest, the school year in New York commences on July 1, *see* N.Y. Educ. Law §
2(15), although cases that have dealt with the issue of a delayed FNR have considered the school year to start in
September, *see Tarlowe*, 2008 WL 2736027, at *6; *Bettinger*, 2007 WL 4208560, at *8.  Thus, if, as of June 18,
T.C. had actually still been considering A.C.'s school options, the DOE would have had time to correct the failed
mailing before it became a procedural violation that resulted in denial of a FAPE.  Because T.C.'s June 18 letter
informed the DOE that she had made a final decision to enroll A.C. at Rebecca, it is impossible to know whether the
DOE would have corrected this potential procedural violation before the start of the 2012-13 school year.

[12]     The SRO Decision does not address this issue.

procedural misstep, neither resulted in the denial of a FAPE nor interfered with T.C.'s ability to participate in the decision-making process.

### B. The IEP Was Substantively Adequate

#### 1. 6:1:1 Program

Plaintiffs levy six substantive critiques against the IEP.  First, they assert that the IEP's proposed staffing ratio of 6:1:1 would not provide A.C. enough individualized attention to advance academically.  Pls. Mem. 13-16.  Plaintiffs argue that the record shows that A.C. required 1:1 instruction to progress and that the IEP failed to provide any 1:1 instruction.  *Id.* at 14, 15.  Plaintiffs also argue that the 2011 Rebecca Progress Report indicates that A.C.'s participation in group activities was limited and only possible with the support of an adult and a "sensory diet" implemented throughout the day.  *Id.* at 15 (citing Ex. 2, at 3-4; Tr. 134-35).  Plaintiffs urge this Court to reject the SRO's conclusion that the recommended supplemental 1:1 services such as OT, speech-language therapy, and counseling satisfy his need for 1:1 instruction within a classroom setting.  *Id.* at 16.  In response, the DOE argues that the SRO's finding, upholding as appropriate a 6:1:1 classroom, was correct because: (1) even at Rebecca, A.C.'s instruction was not exclusively 1:1 as he was in an 8:1:3 class; (2) A.C. needs 1:1 support only in particular situations; (3) the testimony did not show that A.C. could not learn in a small group setting; and (4) the recommended program provided some 1:1 support.  Def. Mem. 14-15.

Plaintiffs' objection to the IEP's recommendation of a 6:1:1 class staffing ratio cannot be sustained.[13]  Although the IHO concluded that the 6:1:1 setting was inappropriate because there

---

[13]     Plaintiffs argue that it is the DOE's burden to prove that the 6:1:1 program was appropriate for A.C.  Pls. Reply 13.  As stated previously, "[u]nder New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing."  *M.O.*, 793 F.3d at 243.  Nevertheless, "the burden of demonstrating that the respective Review Officer erred is properly understood to fall on the plaintiffs."  *M.H.*, 685 F.3d at 225 n.3; *see W.T. & K.T. ex rel. J.T. v. Bd. of Educ. of Sch. Dist. of N.Y.C.*, 716 F. Supp. 2d 270, 287 (S.D.N.Y. 2010) (Because "the DOE prevailed at the SRO level," "[i]t is thus incumbent upon

was no evidence demonstrating that A.C. no longer required the 2:1 instruction he was receiving at Rebecca, IHO Decision 23, the SRO concluded that the 6:1:1 setting, combined with supplemental 1:1 services, appropriately addressed A.C.'s needs, SRO Decision 11.  After a thorough review, the Court agrees with the SRO and finds its Decision to be well-reasoned and supported by the record; therefore, the SRO's conclusion is entitled to deference.  *See, e.g.*, *C.L.*, 744 F.3d at 838 (courts should generally defer to the SRO over the IHO unless the SRO's decision is insufficiently reasoned and the IHO's decision is more carefully considered).

A 6:1:1 special class placement is designed for students "whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(h)(4)(ii)(a).  The SRO considered evidence from a variety of sources to decide whether A.C.'s needs could be met in a 6:1:1 setting.  The SRO took into account that A.C. needed help in the areas of motor skills, sensory regulation, and social/emotional functioning.  SRO Decision 10 (citing Tr. 96-100, 130-31, 156-58).  The SRO considered Dr. Czarnecki's testimony that the CSE developed the present-level of performance section of the IEP through discussions with A.C.'s teacher and mother, *id.* at 10 (citing Tr. 13-21),[14] acknowledging that A.C.'s teacher and mother expressed reservations whether a 6:1:1 setting would address A.C.'s needs, *id.* at 11 (citing Tr. 194).  The SRO noted the IEP's recommendation for additional related services with higher staffing ratios, including:

---

the Parents to bring to the Court's attention any procedural or substantive flaws and explain why they allegedly warrant reversal.").

[14]     Dr. Czarnecki also testified that the CSE relied on the 2011 Rebecca Progress Report and the 2009 Evaluation Report to develop the present-level of performance section of the IEP.  Tr. 13-14, 17-19.

       To the extent Plaintiffs object to the credibility of Dr. Czarnecki's testimony in support of the substantive validity of a 6:1:1 setting due to his alleged lack of experience teaching autistic children and observing A.C., *see supra* n.9, his testimony in support of a 6:1:1 setting is buttressed by the 2011 Rebecca Progress Report and T.C.'s and Rebecca personnel's testimony, none of which indicates that A.C. required 1:1 or 2:1 instruction all—or even most—of the time in order to receive educational benefits, see discussion *infra*.

four 30-minute sessions per week of speech-language therapy, of which two sessions are 1:1 and two sessions are 3:1; four 30-minute sessions per week of OT, of which two sessions are 1:1 and two sessions are 2:1; two sessions of 30-minute counseling per week, of which one session is 1:1 and one session is 2:1. *Id.* at 10 (citing Ex. 1, at 11-12).  In addition, the SRO accounted for the following supports recommended by the IEP to manage A.C.'s needs: high interest stories, mathematics manipulatives, number lines, sensory support, visual and verbal clues, redirection, calming effect, and visual and verbal prompts. *Id.* (citing Ex. 1, at 1-2).  The SRO took into account the discrepancy between Dr. Czarnecki's testimony that the CSE considered and rejected classes with various larger ratios and the absence of any discussion in the IEP of other placement options. *Id.* at 11 & n.2 (citing Tr. 51-53; Ex. 1, at 17).

The SRO also considered the record as a whole to determine that there was no indication in the record that A.C. could not receive educational benefits in the recommended 6:1:1 setting. The SRO pointed out that A.C. did not receive 1:1 instruction at Rebecca, where he was placed in an 8:1:3 class (a 2:1 student-staff ratio versus 3:1 in the IEP recommendation). *Id.* at 11 (citing Ex. 2, at 1).  Further, the SRO noted that the 2011 Rebecca Progress Report described A.C.'s progress in group settings, including group reading and actively participating in classroom group activities. *Id.* (citing Ex. 2, at 3-4).[15]  The evidence to which Plaintiffs point shows only that A.C. needed individual support in particular situations—to engage in continuous unscripted conversation, to acquire and then transfer a new skill to other settings, and to bring him back to the classroom when he becomes confused or upset during a task.  Pls. Mem. 14-15 (citing Ex. 2, at 2; Tr. 112-13, 123, 132-34).[16]  Thus, taking into account A.C.'s needs and his

---

[15]     Significantly, the IEP stated A.C. is "able to join in and participate during group activities for about 90 percent of the activity."  Ex. 1, at 2.

[16]     The 2011 Rebecca Progress Report does not support the argument that A.C. *needs* a 1:1 environment to engage in continuous unscripted conversation.  It states that "A.C.'s *best example* of a continuous flow is when he is

capacity to function in a group setting, the SRO properly determined that A.C.'s case is not

comparable to *C.F.*, where the court rejected a 6:1:1 recommendation as inappropriate given "the

overwhelming testimony that 1:1 instruction was necessary," 746 F.3d at 81; SRO Decision 11.[17]

Finally, the SRO found that the provision of some 1:1 support through the therapy and

counseling sessions was sufficient to meet A.C.'s needs for more individual support.  *Id.* at 12

(citing Ex. 1, at 19).[18]  Given the SRO's thorough consideration of the appropriateness of the

6:1:1 recommendation for A.C., the Court concurs with the SRO's finding that the

recommendation was appropriate.

---

in a one to one setting with an adult and minimal visual distractions." Ex. 2, at 2 (emphasis added).  This, however, does not mean that A.C. *cannot* engage in continuous conversation in any setting other than 1:1 with an adult.

[17]    For the same reason, this Court rejects Plaintiffs renewed arguments that A.C.'s case is comparable to *C.L.*, 2013 WL 93361.  The evidence in that case was more robust and compelling that the student could only receive educational benefits in a 1:1 setting.  *Id.* at *3, 6 (describing that student received "significant amount of 1:1 instruction," "1:1 occupational therapy five times a week," and "individualized speech therapy four times a week" and noting testimony of autism specialist who worked with the student that the student "requires a one-on-one" to learn new material and testimony of the father and teachers that the student would not receive educational benefits in a small group class).  In contrast, T.C. testified that she and A.C.'s teacher and social worker opposed the 6:1:1 setting because "in order for them to get the best out of [A.C.], he needs to be surrounded by the same people and a larger group of teachers."  Tr. 194.  Ms. McCourt, the director of Rebecca, testified that A.C. would benefit more from a staffing ratio smaller than 6:1:1 but did not testify that A.C. could only receive education benefits in a smaller setting, let alone a setting as small as 1:1.  Tr. 112.  Objecting to a 6:1:1 setting *to get the best* out of a student is not the same as a student *requiring* a 1:1 setting to receive educational benefits.  To be substantively adequate, an IEP need not furnish every special service necessary to maximize each disabled child's potential but need only "afford the student with an opportunity greater than mere trivial advancement."  *M.O.*, 793 F.3d at 239 (quotations and citation omitted); *see also M.H.*, 685 F.3d at 224; *A.C.*, 553 F.3d at 173.

[18]    Plaintiffs argue that these 1:1 related services are insufficient to meet A.C.'s needs because they do not take place within the classroom.  Pls. Reply 11.  As the DOE argues, however, given A.C.'s need for 1:1 support in discrete areas, the 6:1:1 setting, which provides for a 3:1 student to staff ratio (contrasted with the 2:1 ratio at Rebecca), does allow for individual attention throughout the school day as needed.  Def. Mem. 15.  This ad hoc individualized attention would have been complemented by the regularly scheduled 1:1 related services sessions five times per week.  Moreover, the IEP's goals for A.C. incorporate 1:1 instruction in the classroom, including improving reading speed "by following an adult's finger moving for 2 pages of a picture book," Ex. 1, at 5, "constructing a number sentence when given a personalized word problem . . . with adult support," *id.* at 6, "independently verbaliz[ing] his phone number 1 out of 4 opportunities when asked by an adult and given the first number for support," *id.*, and "expanding on his pretend play by accepting and elaborating on an idea provided by an adult," *id.* at 5.

### 2. Transitional Support Services

Plaintiffs insist that the IHO was correct in concluding that the IEP should have provided transitional services to A.C. because he would receive less 1:1 special education support in the DOE recommended program than at Rebecca. Pls. Mem. 19-21; Pls. Reply 14-15. Specifically, Plaintiffs maintain that because A.C. tends to limit his communication to preferred adults and needs to improve developing relationships with multiple adults and peers, access to fewer teachers during the day in the 6:1:1 setting would impede his ability to communicate, relate, and learn. Pls. Mem. 20-21. According to Plaintiffs, A.C. requires transitional support services to meet the new challenge of expanding the group of people to whom he relates, and the lack of transitional support services, therefore, denies A.C. a FAPE. *Id.* at 21; Pls. Reply 15. The DOE argues that A.C. was not entitled to transitional support services because the law only requires such services when the student is moving to a less restrictive setting, and the IHO misunderstood the meaning of restrictiveness. Def. Mem. 17.

As the SRO pointed out, SRO Decision 12, transitional support services are temporary services supplied "by an experienced autism teacher to '*a regular or special education teacher*' in order to aid that teacher in addressing the autistic child's needs." *M.S. v. N.Y.C. Dep't of Educ.*, 2 F. Supp. 3d 311, 327 (E.D.N.Y. 2013) (emphasis in original) (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(ddd)). "New York law requires that transitional support services be included in an autistic child's IEP when the 'student has been placed in programs containing students with other disabilities, or in a regular class placement.'" *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(a)(6)). A less restrictive environment refers to the ratio of special education to general education students in the same classroom, 20 U.S.C. § 1412(a)(5)(A), not the ratio of special education students to teachers, as the IHO implied, IHO Decision 23.

Because A.C.'s public school placement was a classroom with only special education students, Ex. 3, transitional support services would only have been required if he was being placed in a class with students with other types of disabilities.  It is not clear from the record whether A.C.'s class at the public school placement would have included children with other types of disabilities.  Even ignoring that evidentiary gap, given that the burden of persuasion falls on Plaintiffs, *M.S.*, 2 F. Supp. 3d at 327 (citing *M.H.*, 685 F.3d at 225 n.3), this Court finds that Plaintiffs have not shown that the lack of transitional services denied A.C. a FAPE.  The IEP did provide A.C. with other support services (OT, speech-language therapy, and counseling) that would have resulted in direct access to different adults multiple times per week, which would have addressed, at least in part, Plaintiffs' concerns. Ex. 1, at 12.  Although additional transitional support services might have maximized A.C.'s potential, the IEP must only provide "opportunity greater than mere trivial advancement."  *M.O.*, 793 F.3d at 239.  Plaintiffs have not shown by a preponderance of the evidence that this IEP would have failed to do so.  *See FB v. N.Y.C. Dep't of Educ.*, No. 14 CIV. 3902 (PAE), 2015 WL 5564446, at *21 (S.D.N.Y. Sept. 21, 2015) (given the SRO's expertise regarding how best to transition an autistic student, court deferred to the SRO's finding that failure to include transitional support services did not rise to the level of a denial of a FAPE when the IEP was viewed as a whole); *M.S.*, 2 F. Supp. 3d at 328 (finding the failure to identify transitional services did not render the IEP inappropriate given the array of services provided in the IEP).

To the extent that Plaintiffs are contending that IDEA always requires transitional support services, the Court disagrees.  Plaintiffs cite one federal district court decision for the proposition that when a CSE is aware that a student has difficulty transitioning, it must at least consider including transitional support services in the IEP.  *A.Y. v. Cumberland Valley Sch. Dist.*, 569 F. Supp. 2d 496, 509-10 (M.D. Pa. 2008) ("When a school district knows that a child requires a

transition plan to return to that district from a private school placement and that school district

does not include a transition plan in the IEP, the IEP is not appropriate.").  "Although that may

be true in certain circumstances, there is no requirement in the IDEA for a transition plan when a

student moves from one school to another."  *A.D.*, 2013 WL 1155570, at *8 (quotation marks

and citations omitted); *FB*, 2015 WL 5564446, at *21 (collecting cases).  Unlike in the case cited

by Plaintiffs, this IEP did provide A.C. with other support services, as discussed *supra*.  Ex. 1, at

12.  Viewed as a whole, the Court finds that the IEP was adequate without transitional support

services.  *See e.g.*, *A.D.*, 2013 WL 115570, at *8-9 (finding IEP sufficient despite lack of

transitional support services given other services).

### 3.  Lack of DIR Methodology[19]

Plaintiffs argue that A.C.'s IEP was inadequate because it failed to recommend DIR

methodology to implement A.C.'s goals, even though the goals themselves were allegedly

developed using DIR methodology.  Pls. Mem. 23-25.  The DOE replies that the record does not

include evidence that A.C. could only progress with DIR methodology and that this is a question

of educational policy over which this Court should defer to administrative officers.  Def. Mem.

20-21.  The Court agrees with the DOE.

"'[Administrative] [d]ecisions involving a dispute over an appropriate educational

methodology,' such as the necessity *vel non* of [Applied Behavioral Analysis], DIR Floortime or

a 'sensory gym,' are subject to considerable deference."  *N.S.*, 2014 WL 2722967, at *6 (quoting

*C.F.*, 746 F.3d at 77 n.7); *see also A.S. ex rel. S.*, 573 F. App'x at 66 (noting "require[ment] to

give particular deference to state educational authorities on the issue of educational

---

[19]      This type of claim can be both procedural and substantive.  *See, e.g.*, *R.B. v. N.Y.C. Dep't of Educ.*, 589 F.
App'x 572, 576 n.2 (2d Cir. 2014).  To the extent this claim implicates both substantive and procedural elements of
the IEP, the rationale articulated here applies equally to reject the procedural and substantive aspects of the claim.

methodology" pursuant to *Rowley*, 458 U.S. at 207)).  The SRO's decision that there was no evidence to support Plaintiffs' argument that the IEP was required to include a specific methodology was well-reasoned and thorough as to both the law and the facts.  As the SRO explained, SRO Decision 9, a CSE is not required to specify methodology in an IEP.   Unless a specific methodology is required for a student to receive an educational benefit, *see K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.,* 530 F. App'x 81, 86 (2d Cir. 2013), the choice of pedagogic methodology is appropriately left to the teacher.  *See Rowley*, 458 U.S. at 207-08; *A.S. ex rel. S.*, 573 F. App'x at 66; *M.H.*, 685 F.3d at 257.

Plaintiffs have not shown that the SRO's decision was wrong.  There is evidence indicating that A.C. benefits from the DIR methodology, Ex. 2, at 1, but there is no evidence that A.C. can *only* receive an educational benefit and achieve the IEP goals through use of that methodology.  *See* Tr. 39.[20]  Ms. McCourt from Rebecca testified that the goals for A.C.'s 2012-13 school year were developed based on DIR and that a teacher unfamiliar with DIR could not implement the goals because "you can't implement a model that you don't know that [sic] that model is."  Tr. 114-15.  That testimony reflects considerable confidence in a single teaching methodology, but it does not explain why the IEP's goals—which are methodologically-neutral[21]—can only be achieved using DIR methodology.  On this record, the Court cannot conclude that A.C. would only progress if taught using DIR methodology.  *See* A.*S. ex rel. S.*, 573 F. App'x at 66 (deferring to SRO decision on education methodology and holding that

---

[20]     Plaintiffs argue, building on the IHO's determination, IHO Decision 22, that those familiar with A.C.'s needs were not granted the opportunity to provide the CSE with information as to what methodologies A.C. requires because Dr. Czarnecki told them that it is the DOE's policy not to mandate a specific methodology.  Pls. Mem. 23-24.  Plaintiffs and the IHO, however, cite nothing in the record, nor could the Court find anything, to support the contention that the CSE denied them the opportunity to present evidence regarding A.C.'s needs.

[21]     Although the goals are generally methodologically neutral, the IEP, at times, slips into DIR jargon, using the term "circle of communication," for example.  With all due respect to the proponents of DIR, one does not have to have been trained in DIR to understand what a "circle of communication" is.

student was not denied a FAPE because the record did not establish with certainty that student could only progress under a specific methodology); *K.L. ex rel. M.L.*, 530 F. App'x at 86 (finding no substantive deficiency in IEP that did not specify particular methodology because parents had not demonstrated their child required a particular method); *R.B.*, 589 F. App'x at 576 (deferring to SRO's decision that IEP's failure to mandate use of DIR/Floortime did not deny student a FAPE even though student's parents claimed DIR/Floortime was the only effective methodology for the child); *A.D.*, 2013 WL 1155570, at *12 (finding methodologies in placement classroom would have been appropriate even though parents contended that the IEP goals were based on DIR methodology).  In short, the CSE was not required to specify DIR methodology in the IEP, and A.C. was not denied a FAPE based on its failure to do so.[22]

### 4.  Sensory Needs

Plaintiffs next argue that the IEP was inadequate because its description of A.C.'s sensory needs was too vague to guide instruction.  Pls. Mem. 25.  Neither the IHO nor the SRO Decisions addressed this issue, although Plaintiffs raised it in their due process complaint.  Ex. A, at 2.

---

[22]    Plaintiffs cite to *FB*, 2015 WL 5564446, at *24, for the proposition that where terminology in the IEP goals uses DIR-specific terminology, the IEP implicitly adopts DIR methodology as the methodology to be used. Pls. Reply 20-21. Ms. McCourt testified that "circle of communication" is DIR-specific terminology, Tr. 113-14, and several of the IEP's goals for A.C. incorporate that term, Ex. 1, at 5, 6, 7, 8. The violation in *FB*, however, was not that the IEP failed explicitly to articulate DIR as the exclusive methodology to be used with the student. Instead, *FB* held that because the IEP implicitly "embraced a particular education methodology" and because the evidence showed *that the placement school was not able to implement* the methodology, the student was denied a FAPE. 2015 WL 5564446, at * 24. In this case, even if the IEP implicitly adopted DIR (and the Court does not believe that it did), the claim that the placement school could not implement DIR methodology is an impermissibly speculative claim because Plaintiffs have placed nothing in the record to show that the school did not have the capacity to implement DIR. *See M.O.*, 793 F.3d at 244, 245-46 (holding that (1) if a student's IEP is substantively adequate, the parents must adduce some evidence that the school could not or would not have adhered to the IEP, and (2) arguing that a school with the capacity to implement the IEP will simply fail to do so is an impermissible speculative claim (citation omitted)); *R.E.*, 694 F.3d at 195 (holding mere "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement").

The Court agrees with the DOE that A.C.'s sensory needs are adequately addressed in the IEP.  The IEP states that "[A.C.] needs a large amount of sensory input throughout the day to maintain his regulation, too much movement might cause him to become easily dysregulated." Ex. 1, at 2.  The IEP lists strategies, including sensory support, to meet A.C.'s sensory and other needs.  *Id.* at 3.  The IEP also lists specific annual goals relating to A.C's sensory needs and development, including (1) "minimizing his sensory breaks" during lunch and (2) "improv[ing] sensory processing and regulation needed to understand and effectively interact with people and objects," "as evidenced by independently modulating the speed and intensity of his movements," "expanding and deepening his peer relationships," and self-regulating while participating in structured movement activities.  *Id.* at 6-7.  Although Plaintiffs contend the IEP fails to specify the sensory tools A.C. requires, the type of "input" that would be appropriate, and the type and frequency of movement A.C. requires, Pls. Mem. 26, the law does not require every aspect of a child's specific educational needs to be detailed in the IEP, as long as the IEP is designed to address those issues.  *GB*, 2015 WL 7351582, at *13 (citing *P.G. v. N.Y.C. Dep't of Educ.*, 959 F.Supp.2d 499, 512 (S.D.N.Y. 2013)).  This IEP meets that threshold.  *Id.* (holding IEP sufficiently addressed student's sensory needs by listing strategies to address student's sensory needs, setting sensory goals, and noting student's sensory improvement).

### 5.   Recommendation to Participate in State and District Assessments

Plaintiffs contend that the IEP inappropriately required A.C. to participate in generalized assessments instead of alternate assessments.  Pls. Mem. 21-23.  Plaintiffs argue that the SRO failed to assess properly A.C.'s level of functioning by not taking into account: (1) testimony by those who know A.C. that he functioned at a kindergarten level, although he was eight years old; (2) that the 2009 Evaluation Report was outdated; and (3) that A.C.'s previously-measured verbal IQ placed him in the 2nd percentile.  *Id.* at 22.  The DOE counters that A.C. does not have

sufficiently severe cognitive disabilities to be exempt from general assessments under New York law. Def. Mem. 18-20. The Court agrees with the DOE and defers to the well-reasoned decision of the SRO that arrives at the same conclusion, SHO Decision 8.

Students with disabilities must be included in general state and local assessments, with appropriate accommodations and alternate assessments designated in their IEPs if necessary. 20 U.S.C. § 1412(a)(16)(A); 34 C.F.R. § 300.160(a). Under the IDEA, alternate assessments are for "the child [who] *cannot* participate in the regular assessment." 20 U.S.C. § 1414(d)(1)(A)(i)(VI)(bb)(AA) (emphasis added). In New York, "only students with severe cognitive disability are eligible for [alternate assessments]." New York State Office of State Assessment, *A Parent's Quick Guide to the New York State Alternate Assessment*, 2 (available at http://www.p12.nysed.gov/assessment/nysaa/2013-14/nysaapgbrochure-engw.pdf) (last visited March 29, 2016). Testing requirements for special education students reflect a policy decision not to lower the standards for students with disabilities vis-à-vis general education students, but instead to accommodate their disabilities while holding them to the same standards. *See Connecticut v. Spellings*, 549 F. Supp. 2d 161, 164-67 (D. Conn. 2008), *aff'd as modified sub nom. Connecticut v. Duncan*, 612 F.3d 107 (2d Cir. 2010) (tracing history of special education testing policy as established by the No Child Left Behind Act and the IDEA by examining statutory and regulatory language and statements by the Secretary of Education).

The record does not show that A.C. has a sufficiently severe cognitive disability that he is unable to participate in general assessments. Dr. Czarnecki did not have any documentation or reason to believe A.C. should be exempt from general assessments. Tr. 64. The SRO credited Dr. Czarnecki's testimony that A.C.'s 2009 Evaluation Report, showing a nonverbal IQ in the 53rd percentile and "low average" cognitive functioning, combined with A.C.'s academic progress since 2009, indicate that A.C. has the ability to participate in general assessments. SRO

31

Decision 8 (citing Tr. 75); *see also* Ex. 1, at 1; Ex. 2, at 3-4.  Moreover, the IEP took A.C.'s

needs and level of functioning into account by recommending testing accommodations, including

double the amount of time, a separate quiet room with minimal distractions, directions and

questions read and re-read aloud, and flexibility in recording answers in the test booklet.  Ex. 1,

at 13.  The evidence that A.C. functioned at a kindergarten level despite his chronological age,

Ex. 1, at 16, had neurodevelopmental and communication developmental delays, *see* Ex. 2, at 1-

6; Tr. 97-98, 130, 147, 156-64, and had a verbal IQ in the 2nd percentile, Ex. 1, at 1, clearly

indicate that A.C. was cognitively disabled.  But, the Court has to defer to the SRO, which has

greater expertise and experience in this area than the Court, for the determination whether a child

with that level of academic functioning is capable of participating in a general assessment with

appropriate accommodations.

### 6. Promotional Criteria[23]

Finally, Plaintiffs argue that, because the IEP fails to specify promotional criteria and

requires A.C. to participate in general assessments, A.C. will be held to the same promotional

criteria as his general education peers, with the result that his teacher cannot know the basis for

promoting A.C. to the next grade or the applicable standards of achievement.  Pls. Mem. 26.  The

DOE argues that nothing requires the IEP to include alternate promotional criteria.  Def. Mem.

23.  Instead, the IEP need only include present levels of performance, a disability classification,

and measurable annual goals, all of which are included in A.C.'s 2012-13 IEP.  *Id.* (citing N.Y.

Comp. Codes R. & Regs. tit. 8, § 200.4(d)(2) and Ex. 1, at 1, 4-11).  While neither the IHO nor

---

[23]    Plaintiffs did not raise this issue in their due process complaint, *see* Ex. A, but they did raise it explicitly in
their Closing Statement and Memorandum of Law submitted to the IHO on April 28, 2014 ("Apr. 2014 Pls. Mem."),
*see* Ex. 4, Apr. 2014 Pls. Mem. 14.  Given that "there is disagreement in this Circuit whether failure to raise a claim
in the [due process complaint] waives the claim," *J.M. v. New York City Dep't of Educ.*, No. 15-CV-353 (VEC),
2016 WL 1092688, at *10 n.16 (S.D.N.Y. Mar. 21, 2016), and given that the DOE had fair notice of this claim, the
Court considers Plaintiffs' argument regarding promotional criteria.

the SRO addressed the promotional criteria claim, the Court, like the DOE, cannot find any law requiring IEPs to include promotional criteria and finds that A.C.'s annual goals delineated in the IEP provided an adequate basis on which a teacher could assess A.C.'s achievement and promotion eligibility.  Plaintiffs cite no legal authority and the Court can find none supporting the proposition that A.C. would have been measured by the same promotional criteria as his general education peers in the absence of modified promotional criteria appearing in the IEP. *See* Pls. Reply 18-19.  Although it may have been wiser and more consistent with New York City policy for the CSE to include alternate promotional criteria in the IEP, there is no evidence that failure to do so denied A.C. a FAPE, denied him educational benefits, or was likely to prevent him from progressing.

Because the Court concludes that the DOE offered A.C. a FAPE, the Court does not reach the second or third prongs of *Burlington/Carter* regarding the appropriateness of Rebecca as a placement or whether the equities favor reimbursement.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED. Defendant's cross-motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to enter judgment for Defendant, to terminate docket entries 15 and 18, and to terminate the case.  The Clerk of the Court is also directed to strike docket entries 16-1 and 17-1, which disclose A.C.'s name.  No later than April 1, 2016, Plaintiffs must refile a redacted version of that exhibit on the docket.

**SO ORDERED.**

Date:  **March 30, 2016**                                    **VALERIE CAPRONI**
       **New York, New York**                           **United States District Judge**

**APPENDIX**

| Acronym | Stands for |
|---------|-----------|
| CSE | Committee on Special Education |
| DIR | Developmental Individual Difference Relationship-based |
| DOE | Department of Education |
| FAPE | Free Appropriate Public Education |
| FNR | Final Notice of Recommendation |
| IDEA | Individuals with Disabilities Education Act |
| IEP | Individualized Education Program |
| IHO | Impartial Hearing Officer |
| T.C. | A.C.'s parent |
| A.C. | The child with a disability seeking reimbursement for his private school tuition |
| SRO | State Review Officer |